**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 17-cv-02846-REB-SKC

JOAN UNREIN,

      Plaintiff,

v.

PHC-Fort Morgan, Inc., d/b/a COLORADO PLAINS MEDICAL CENTER,

      Defendant.

---

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDERS**

---

**Blackburn, J.**

      This matter came before me for a trial to the court on September 30, October 1,

and October 22, 2019.  In her complaint [#4][1] the plaintiff, Joan Unrein, asserts claims

based on the termination of her employment by the defendant, PHC-Fort Morgan, Inc.

The defendant runs a hospital in Fort Morgan, Colorado, and does business as

Colorado Plains Medical Center (CPMC or the hospital).  Ms. Unrein asserts claims for

discrimination on the basis of disability under the Colorado Anti-Discrimination Act

(CADA) and the Americans with Disabilities Act (ADA).  In addition, she asserts claims

for retaliation under the CADA and the ADA.  The claims of Ms. Unrein were preserved

in the **Final Pretrial Order** [#54].

      Having judicially noticed all relevant adjudicative facts in the file and record of

this case *pro tanto*; having considered the stipulations of the parties; having considered

---

[1] "[#4]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

the evidence educed at trial in its various forms; having determined the credibility of the witnesses; having weighed the evidence; having considered all reasons stated, arguments advanced, and the authorities cited by the parties in written and oral form; and being otherwise sufficiently advised, the court enters the following findings of fact established by a preponderance of the evidence, conclusions of law, orders, and judgment.[2]

## JURISDICTION & CONTROLLING LAW

This court has jurisdiction over this case under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental). The ADA and the CADA are parallel statutes. Whenever possible, the CADA should be interpreted consistently with the ADA. *Tesmer v. Colorado High School Activities Ass'n*, 140 P.3d 249, 253 (Colo. App. 2006). Thus, I consider simultaneously the claims of the plaintiff under the ADA and the CADA. Any reference to the ADA should be read to include the parallel provision and related law of the CADA.

## FINDINGS OF FACT

### I. Stipulated Facts

In the **Final Pretrial Order** [#54], the parties stipulated to the facts stated below. I find the stipulated facts to be true.

1. The hospital employed Ms. Unrein from April 2000 to February 2014 as the Food and Nutrition Services Director.   She was scheduled to work forty hours per week in this position.

2. In February 2014, Ms. Unrein transferred to the position of Clinical Dietician.

---

[2]  Any finding of fact more properly deemed a conclusion of law, or any conclusion of law more properly deemed a finding of fact, shall be as more properly characterized.

She was scheduled to work thirty two hours per week in this position.  She held that position until March 31, 2017.

3.  From August 2015, until the separation of her employment, Ms. Unrein was the only Clinical Dietician at the hospital. Throughout that period, Food and Nutrition Services Director, Tracy Fisher, was Ms. Unrein's supervisor.

4.  Ms. Unrein's duties as a Clinical Dietician required her to perform "clinical and advisory duties" for the Food Services Department, provide "current nutritional information and instruction to staff, physicians, and patients as needed," and "work with physicians, nurses, and other department staff in providing quality patient care." She was required to "work in close contact with patients in offices and rooms," "often in confining spaces," "throughout day covers most of hospital," and "work in various departments and spaces with other staff."

5.  In the fall of 2012, Ms. Unrein began having difficulty reading, Eventually, she was diagnosed with vitelliform macular dystrophy, an irreversible condition that distorts her vision. As a result, Ms. Unrein requires a powerful magnifier to read,  motion is difficult for her vision, and she cannot drive. She has some sight, but, legally, is considered to be blind.

6.  Ms. Unrein first provided written information to the hospital about her medical condition in July 2014, followed by a physician notification dated October 28, 2014.  The physician notification restricted her from driving more than 20 miles from her home. Ms. Unrein lives approximately 60 miles from the hospital.

7.  On November 13, 2014, Ms. Unrein requested "clarification regarding travel and expectations of time spent on campus" and "verification of the ability to adjust my schedule to accommodate patient needs and dependence on family/friends ability to

drive me to work." [Ex. 13, Bates p. 618].

8.   Absent temporary housing in Fort Morgan, Colorado, several nights per week, Ms. Unrein remained completely dependent on the availability of rides from family and friends for all of her transportation.  As a result, she could not guarantee she would be able to travel to the hospital on a regular, set schedule.

9.   On January 8, 2015, Ms. Unrein asked the hospital to "adjust[] my daily schedule (time I come in and leave) to accommodate my transportation…[s]ome days I only have transport allowing me to be on campus for 4 or 5 hours" and also requested two sets of magnifying equipment valued at more than $2,000. [Ex. 32].

10.   On January 22, 2015, Human Resources Director Janet Brinkman notified Ms. Unrein that CMPC would purchase all of the requested equipment for Ms. Unrein and instructed Ms. Unrein to

> …communicate with Tracy Fisher, Food and Nutrition Services Director/Chef, in regard to any necessary schedule changes. You are expected to work 32 hours per week with the majority of the work performed on-site. A set schedule communicated with the Director/Chef is necessary to provide quality Dietetic services and ensure patient care is not compromised….
>
> If at any time we feel that your request for accommodation is unreasonable, puts an un-due burden on another employee, reduces the quality of patient care, or risks the safety of yourself or anyone else, we will immediately discuss with you the appropriate action at that time.

[Ex. 36].

11.   Ms. Unrein acknowledged in early April 2016 that the hospital had received poor dietary patient satisfaction scores and she desired to improve those scores.

12.   Mr. Fisher reiterated to Ms. Unrein in an April 15, 2016, meeting that she needed to be present and rounding on floors at The hospital on a regular basis because he believed her presence would improve dietary patient satisfaction scores and her

interactions with the Food Service Department and clinical staff.  Mr. Fisher also requested Ms. Unrein work forty hours per week rather than thirty-two, along with taking on additional data entry and nutritional analysis duties.

13.  In a letter dated April 16, 2016, Ms. Unrein notified the hospital that she could accept the additional duties but only "with the accommodation of a flexible/modified schedule and ability to remote access…. [Ex. 51].

14.  On May 13, 2016, Ms. Unrein requested intermittent leave under the Family Medical Leave Act (FMLA). The hospital granted Ms. Unrein every day of FMLA leave she requested.

15.  Mr. Fisher, Ms. Brinkman, Chief Financial Officer Summer Owen, and Chief Nursing Officer Sonya Bass met with Ms. Unrein on July 11, 2016, to discuss her full time telecommuting request. They inquired about Ms. Unrein's home internet security, how she could ensure the security of confidential patient records, how she could Skype with a patient and family simultaneously, who would transport the computer among patient rooms, and other concerns associated with a hospital clinician requesting to provide patient care remotely full-time.

16.  In a letter dated August 9, 2016, Ms. Unrein said "it is necessary for patient care for me to see the in-patients as much as I can." Ms. Unrein also said that she was struggling to "figure out how to address Tracy's need for structure and my inability to provide long-term scheduling."  [Ex. 70, Bates p. 500].

17.  On August 31, 2016, the hospital declined Ms. Unrein's request to perform all of her job duties remotely full-time.  The hospital's decision was based on the need for at least "four hours per day of face-to-face interactions with patients, families, physicians, and/or other clinical personnel" among other in-person duties requiring

additional hours on site, the technological challenges of Ms. Unrein's home internet speed and capabilities, infection control issues moving a computer among patients' rooms and kitchen areas, and the need to hire a full-time employee to transport equipment between rooms and assist with set-up and the distribution of informational handouts.  [Ex. 70, Bates p. 500].

18.   The hospital told Ms. Unrein that she could apply for other open positions at the hospital.  Ms. Unrein never reviewed or applied for any other positions.

19.   The hospital's stated concerns about Ms. Unrein's telecommuting request were reasonable, honest, and legitimate.

20.   In August 2016, Ms. Unrein had an undiagnosed medical condition – unrelated to her vision issues – that prompted her treating physician to place her on full-time medical leave as of August 22, 2016, with an unknown return to work date. [Ex. 79].  The hospital approved Ms. Unrein for continuous FMLA leave through October 31, 2016.

21.   Ms. Unrein's physician extended her medical leave for one month on October 26, 2016, and again for another month on November 28, 2016. The hospital granted both requests even though Ms. Unrein was not FMLA eligible.

22.   On December 20, 2016, Ms. Unrein's physician notified the hospital that Ms. Unrein was under her care for "multiple medical problems" and Ms. Unrein "will be unable to work in any capacity until further notice." [Ex. 88, Bates p. 77]. The hospital extended Ms. Unrein's medical leave of absence again.

23.   None of Ms. Unrein's physicians ever notified the hospital that Ms. Unrein was released to return to work from her full-time medical leave of absence. None of her treating physicians has since released her to return to work in any capacity.

6

24.   One of Ms. Unrein's treating physicians imposed restrictions, effective August 22, 2016, that prohibited her from "writing" and "computer work" with no end date. [Ex. 79].  "Writing" and "computer work" are essential functions of Ms. Unrein's Clinical Dietician position.

25.   On February 8, 2017, Ms. Unrein completed her application for Social Security Disability Insurance (SSDI) benefits with the Social Security Administration (SSA). To obtain benefits, Ms. Unrein told the SSA that she "became unable to work because of my disabling condition on August 23, 2016," and that she was still disabled.

26.   The SSA approved Ms. Unrein's application and awarded her SSDI benefits, which she continues to receive to this day.

27.   Ms. Unrein also applied and was approved for long-term disability benefits in January 2017.

28.   The hospital notified Ms. Unrein that her employment would be separated effective March 31, 2017. The hospital noted in its letter to Ms. Unrein that it had explored accommodations with Ms. Unrein, "but you have made clear that you are unable to perform the essential functions of your job on a full-time basis at the hospital." During Ms. Unrein's employment, the hospital had a policy prohibiting disability discrimination and retaliation.

29.   Although not explicitly stipulated, it is undisputed that the following people held the following positions at the hospital at the times relevant to this case: Janet Brinkman - Human Resources Director; Summer Owen - Chief Financial Officer; Tracy Fisher - Food and Nutrition Services Director; and Sonya Bass - Chief Nursing Officer.

## II.  Essential Functions & Duties of Clinical Dietician

30.  In addition to the duties specified in paragraph four above, the essential job functions and responsibilities of the Clinical Dietician position also required Ms. Unrein to be physically present at the hospital and to have a set schedule to ensure quality patient care. [Vol. I at 24:22–25:16, 61:12–19, 84:8–16 (Janet Brinkman)[3]; Vol. III at 437:8–19 (Summer Owen), 478:21– 479:17 (Tracy Fisher)].  For example, Ms. Unrein needed to be present at the hospital to consult with patients who were hard of hearing, to educate patients on nutritional issues, to examine patients' food trays to insure compliance with their nutrition plan, to assess patients' pain, to answer patient call lights on matters related to nutrition, and to perform high-risk patient assessments. [Vol. I at 108:11–15, 113:4–15 (Janet Brinkman); Vol. II at 244:2–245:15, 247:18–249:6, 253:14–255:2] (Ms. Unrein)].

## III.  Requests for Accommodation, Job Performance, & Responses

31.  On October 28, 2014, Ms. Unrein's eye doctor restricted her from driving more than 20 miles from her home. [Ex. 100].  Ms. Unrein lives about 60 miles from the hospital.   As a result of her vision problems, Ms. Unrein was and is unable to drive herself to work.  Rather, she was and is dependent on the availability of rides from family and friends for all of her transportation.  While employed at the hospital, she generally could not guarantee she would be able to travel to the hospital for work on a regular, set schedule. [¶¶ 7-8, above; Vol. II at 222:24–223:19, 269:4–270:1 (Ms. Unrein)].

---

[3]  I use this format to reference transcripts of the trial in this case.  In the record, these transcripts are assigned the following docket numbers: Vol. I [#62], Vol. II [#63], Vol. III [#64].

32.   The same day it received a copy of Ms. Unrein's restrictions – October 31,

2014 – the hospital began the interactive good faith accommodation process by

requesting additional information from Ms. Unrein about her medical condition and the

accommodations she was requesting in order to perform her job. [Ex. 11; Vol. I at

73:3–74:12 (Janet Brinkman); Vol. II at 274:5–17 (Ms. Unrein)].   The hospital provided

Ms. Unrein with a form to provide details about any accommodation Ms. Unrein was

seeking. [Ex. 11.] The hospital asked Ms. Unrein to return the form by November 7,

2014. *Id.*

33.   Throughout the interactive accommodation process, most of Ms. Unrein's

accommodation requests were directed at addressing her mobility/transportation barrier.

[Vol. II at 233:18–234:5 (Ms. Unrein)].   She said she had no problems performing her

essential job functions once she was at the hospital. [Vol. II at 215:2-216:16;

233:18–234:5 (Ms. Unrein)].

34.   The hospital provided Ms. Unrein with a larger computer screen at the

hospital.   In addition, the hospital provided her with magnification equipment for use at

the hospital and for use at Ms. Unrein's home. [Ex. 32 at 1; Ex. 34 at 1; Ex. 36; Ex. 37;

Vol. I at 76:6–77:1 (Janet Brinkman); Vol. II at 226:4–227:6 (Ms. Unrein)].   Completing

computer work was an essential function of Ms. Unrein's job.   [Vol. II at 226:24–227:3

(Ms. Unrein)].

A.  First Request for Accommodation & Job Performance

35. After being granted an extension of time to submit her request for

accommodation, Ms. Unrein submitted her first written request for accommodation on

November 13, 2014. [Ex. 13].[4]

36.   In her November 13, 2014, request, Ms. Unrein asked the hospital to clarify its expectations regarding travel and time spent at the hospital.  In addition, she asked the hospital to confirm her ability to adjust her schedule to accommodate patient needs and to address her dependence on rides from family and friends to get to work. [Ex. 13, Bates p.618].

37.   Among other things, Ms. Unrein asked that her schedule be arranged so she only needed to get rides two days per week.  [Ex. 13, Bates p. 618]. She said that could be accomplished "either by having a place to stay or increasing my days to work remotely." *Id.*  She noted, "I know the hospital is paying for rooms for other employees and request to be included." *Id.*   On cross-examination at trial, Ms. Unrein testified that she withdrew any request she may have made for housing and no longer expected the hospital to pay for her housing. [Vol. II at 232:24–233:17 (Ms. Unrein)].

38.   On December 3, 2014, while the hospital was considering the November 13, 2014, submission, Ms. Unrein requested that the Human Resources Department postpone consideration of her request for accommodation while she investigates vocational rehabilitation. [Ex. 15; Vol. I at 79:24-80:6 (Janet Brinkman)].

39.   Nevertheless, the hospital continued to explore the request and its reasonableness.  On December 3, 2014, Chief Nursing Officer, Sonya Bass, sought to determine if any of CPMS's affiliated hospitals had any type of remote working arrangements with Clinical Dieticians. [Vol. I at 78:7–79:6 (Janet Brinkman); Exs. 16,

---

[4]  The first three pages of Exhibit 13 are a hospital form completed by Ms. Unrein.  In completing this form, Ms. Unrein repeatedly refers to an attachment. The form is dated November 7, 2014.   The attachment is a four page typewritten document prepared by Ms. Unrein.  The attachment is dated November 13, 2014.  Because the attachment contains the substance of this request for accommodation, I find that this request for accommodation was submitted on or about November 13, 2014.

17, 18].

40.   During the week of December 8, 2014, while Ms. Unrein was scheduled to work, some patients were discharged without receiving required dietary consults from Ms. Unrein.  Several staff members reported that they were unable to reach or locate Ms. Unrein.  [Vol. I at 83:4–84:23 (Janet Brinkman); Vol. III at 416:22–421:11 (Summer Owen); 484:17–485:5 (Tracy Fisher); Exs. 19, 20, 21, 22].

41.   Mr. Fisher discussed his concerns with Ms. Unrein and told her she needed to establish a set and regular schedule, arrange for a point of contact when she is unavailable, and communicate that information with him and nursing.  [Vol. III at 484:17–486:13 (Tracy Fisher); Ex. 20.]

42.   On December 12, 2014, Ms. Unrein advised Janet Brinkman that Ms. Unrein was going to revise her request for accommodation.  She said she would wait to do so until they met in January 2015. [Ex. 20].

43.   During the week of December 15, 2014, having received additional reports about Ms. Unrein's unavailability and its negative impact on patient care, Mr. Fisher reiterated to Ms. Unrein his expectations that she notify him and nursing of her schedule, including the days she would be out of the hospital and her availability to "round" on patients.  [Vol. III at 485:6–486:22 (Tracy Fisher); Exs. 21, 26].

44.   On December 22, 2014, Ms. Unrein said that she was leaving work early, and she left early. [Ex. 23]. She did not seek Mr. Fisher's permission; instead, she made a unilateral decision to leave. [Vol. III at 423:8–424:5 (Summer Owen)].

45.   On December 23, 2014, although she was scheduled to work at the hospital and was expected, Ms. Unrein was unable to make it to the hospital because her ride to work cancelled due to another commitment. [Vol. III at 486:23–489:19; Ex. 23].

Ms. Unrein told Mr. Fisher that she was going to work "remotely" for the remainder of the week, but Mr. Fisher honestly did not believe there was enough work for her to do remotely. [Vol. III at 486:23–489:19; Ex. 23].

46. As a result of Ms. Unrein's unilateral decision to work remotely, a situation apparently caused by her inability to get a ride to the hospital from her home, there were five consecutive days with no dietician on site at the hospital to see patients or consult with providers and nursing. These circumstances violated hospital policy and negatively impacted the care of at least seven different patients who did not receive dietary consults. [Vol. III at 489:20–492:19 (Tracy Fisher); Exs. 23, 24, 26, 29, 31].

47. Believing her performance was unsatisfactory, and consistent with the feedback and instructions that Mr. Fisher had provided to Ms. Unrein earlier that month, Ms. Bass and Mr. Fisher met with Ms. Unrein on December 31, 2014. They told her she was not following through on screening referrals and physician-ordered nutrition consults and that her failure to do so violated the hospital's policies and was impacting patient care negatively. [Vol. III at 424:22–425:14 (Summer Owen); Ex. 31 at 2–3]. Ms. Bass reminded Ms. Unrein that all nutrition screening referrals must be performed in-person by the Clinical Dietician within 48 hours and that all physician-ordered consults must be performed in person by the Clinical Dietician within 24 hours. [Vol. III at 424:22–425:14; Ex. 31 at 2– 3]. Mr. Fisher also told Ms. Unrein that she must be on-site to train the new part-time Clinical Dietician, Amy Lofley, who the hospital had recently hired to help. [Vol. III at 424:22–425:14; Ex. 31 at 1].

48. From November 13, 2013, through December 31, 2014, the concerns articulated by Sonya Bass, Janet Brinkman, Summer Owen, and Tracy Fisher were sincere, honest, and legitimate.

## B.  Plaintiff's Revised First Request for Accommodation & Job Performance

49.  On January 8, 2015, Ms. Unrein revised her request of November 13, 2014, by asking the hospital to adjust her daily schedule from consistent days and hours of work to a variable schedule dependent solely on her ability to get a ride to work.  [Ex. 32, p. 2].  She acknowledged that her ability to get a ride to work was unpredictable. [Vol. II at 219:8–222:1].  It was in this revised request that Ms. Unrein requested magnifying equipment, which the hospital provided.

50.  On January 14, 2015, Ms. Brinkman, Ms. Owen, and Mr. Fisher met with Ms. Unrein to discuss her revised request for accommodation. [Vol.I at 88:6–88:22 (Janet Brinkman); Vol. III at 495:23–496:2 (Tracy Fisher); Ex. 34].  Ms. Unrein was asked about her request for an unpredictable schedule that was dependent on others for rides to the hospital and reiterated the importance of her being physically present at the hospital to train the new part-time dietician. [Vol. I at 90:17–91:2 (Janet Brinkman); Vol. III at 496:6–13 (Tracy Fisher); Ex. 34]. Mr. Fisher expressed his concern that he did not know when Ms. Unrein will be on-site, and Ms. Unrein agreed to do a better job of letting Mr. Fisher know her schedule. [Vol. III at 496:14–498:5 (Tracy Fisher].

51.  Ms. Owen stated the importance of structure and communication, ensuring that patient care is not compromised, and that dietetic services are provided in a timely fashion. [Vol. III at 436:19–437:19 (Summer Owen)]. Ms. Owen also expressed her concern that there was not enough work to be performed remotely and that most of the work of the Clinical Dietician role needs to be performed on-site. [Vol. III at 437:20–438:15 (Summer Owen)].

52.  By letter dated January 22, 2015, the hospital reminded Ms. Unrein that she was expected to work 32 hours per week "with the majority of the work performed

13

on-site" and that "a set schedule, communicated with Mr. Fisher, was necessary to provide quality dietetic services and ensure patient care was not compromised." [Vol. III at 500:16–501:13 (Tracy Fisher); Ex. 36]. Ms. Unrein received that communication and agreed with it. [Vol. II at 275:16–276:7 (Ms. Unrein)].

53. From January 8, 2015, through January 22, 2015, the concerns articulated by Sonya Bass, Janet Brinkman, Summer Owen, and Tracy Fisher were sincere, honest, and legitimate.

<u>C. Temporary Partial  Work From Home Arrangement
& Job Performance</u>

54. As part of its accommodation efforts and process, the hospital allowed Ms. Unrein to work from home occasionally and temporarily between January 2015 and April 2016. This measure was employed when Ms. Unrein could not secure a ride to or from the hospital. [Vol. I at 146:19–24 (Janet Brinkman); Vol. II at 258:19–259:3 (Ms. Unrein); Vol. III at 497:21–498:5 (Tracy Fisher].

55. Ms. Brinkman and Mr. Fisher testified credibly that allowing Ms. Unrein to work remotely was intended to be a temporary trial and was never intended to supplant the requirements that she establish a set schedule, communicate her schedule and any schedule changes to Mr. Fisher, and perform the majority of her 32 hours per week working on-site at the hospital.  [Vol. I at 92:5–12 (Janet Brinkman); Vol. III at 497:21–498:5; 500:16–501:16; 585:1–20  (Tracy Fisher)].

56. From January 2015 to August 2015, Amy Lofley worked at the hospital as a part-time Clinical Dietician. [Vol. II at 276:8–16 (Ms. Unrein); Vol. II at 352:8-11 (Amy Lofley); Vol. III at 501:17-22 (Tracy Fisher)]. Ms. Lofley and Ms. Unrein worked together closely. [Vol. II at 276:8-14 (Ms. Unrein); Vol II at 347:17-20 (Amy Lofley). While she

was employed at the hospital, Ms. Lofley was available to cover various Clinical

Dietician duties. [Vol. II at 276:8-14 (Ms. Unrein); Vol. II at 346:1-347:16 (Ms. Lofley)].

Ms. Lofley performed her duties while physically present at the hospital. [Vol. II at 346:1-

347:16 (Ms. Lofley)].  Ms. Lofley resigned her position in August 2015.  From August

2015, when Ms. Lofley left, until Ms. Unrein's last day of active work, August 21, 2016,

Ms. Unrein was the only Clinical Dietician employed by the hospital. [Vol. I at

102:14–103:7 (Janet Brinkman); Vol. II at 276:8–16 (Ms. Unrein)].

57.  From April 2015 through August 21, 2016, Ms. Unrein frequently failed to

establish a set schedule, communicate her schedule and any schedule changes to Mr.

Fisher, and perform the majority of her 32 hours per week working on-site at the

hospital.  [Vol II at 267:8-270:1 (Ms. Unrein); Vol. III at 497:21-499:6 (Tracy Fisher)].

The hospital continued to receive complaints relating to Ms. Unrein's inability to be

present at the hospital on a regular, dependable schedule. [Vol. III at 527:9–529:9

(Tracy Fisher); Ex. 67].  The hospital honestly believed that its dietary patient

satisfaction scores were declining, at least in part, because of Ms. Unrein's failures in

those and other areas.  [Vol. III at 502:20–505:16, 506:17-22 (Tracy Fisher); Ex. 50].

58.  Ms. Unrein's "limited ability to provide help regularly" and "limited [number] of

[patient] and direct interactions" was noted in her April 2016 performance appraisal.

[Ex. 54 at 3–4]. The performance appraisal also notes that Ms. Unrein's "availability . . .

postpones growth opportunities for the position [and] department," and that more on-site

presence "would help with satisfaction [and] inter-department relations." [Ex. 54 at 5].

59.  On April 15, 2016, Mr. Fisher, Ms. Owen, and Ms. Brinkman met with Ms.

Unrein to discuss their view of her performance and the hospital's poor dietary patient

satisfaction scores. [Vol. I at 98:20–101:9 (Janet Brinkman); Vol. III at 504:14–507:19

(Tracy Fisher); Ex. 50]. Mr. Fisher discussed with Ms. Unrein her responsibility for submitting weekly meal equivalency reports, which she had not done since January. [Vol. III at 504:14–507:19 (Tracy Fisher); Ex. 50]. He reminded her that she needed to be regularly present and rounding on floors at the hospital because he believed her presence would improve dietary patient satisfaction scores and her interactions with the Food Services Department and clinical staff. [Vol. I at 98:20–101:0 (Janet Brinkman); Vol. III at 504:14–507:19 (Tracy Fisher); Ex. 50].

60. During the April 15, 2016, meeting, Ms. Unrein said she too desired to improve the dietary patient satisfaction scores. [Ex. 119 at ¶ 11; Vol. II at 277:25–278:4; Ex. 52]. Ms. Unrein agrees that she has no proof that Mr. Fisher did not honestly and in good faith believe that the things he was instructing her to do would result in improved patient satisfaction scores and better patient care. [Vol. II at 256:2–13, 261:17–265:9].

61. As part of his plan to improve patient care and satisfaction scores, Mr. Fisher asked Ms. Unrein to work 40 hours per week rather than 32, along with taking on additional data entry and nutritional analysis duties. [Ex.119 at ¶ 12; see also Vol. III at 431:1–8; Ex. 50].

### D.  Plaintiff's Second Request for Accommodation & Job Performance

62. By letter dated April 16, 2016, Ms. Unrein accepted the additional duties proposed by Mr. Fisher, but only on the condition that the hospital provide her with a flexible/modified schedule and the ability to work remotely as needed.  [Ex. 51; Vol. II at 281:23–282:2 (Ms. Unrein)].  She said she was happy to accept these responsibilities "with the accommodation of a flexible/modified schedule and the ability to remote access as other hospital employees are able to do.  The accommodation request addresses my low vision and inability to drive.  There is no other viable transport

available in our rural area." [Ex. 51].

63.   On May 2, 2016, Ms. Unrein notified Ms. Brinkman again that she could not find daily rides for specific hours to work at the hospital. [Ex. 56].

64.   On May 13, 2016, Ms. Unrein requested intermittent medical leave under the Family and Medical Leave Act (FMLA). [Stipulated Facts, ¶ 14; Ex. 57]. The hospital granted Plaintiff every day of FMLA leave she requested. [Stipulated Facts, ¶ 14].

65.   On May 20, 2016, Mr. Fisher discussed with Ms. Brinkman his ongoing concern with Ms. Unrein's work performance, including her continued inability to be available to make diet changes, work on nutritional analysis, meet with him and nursing, and conduct meal counts. [Vol. I at 109:5–110:2 (Janet Brinkman); Vol. III at 517:7–518:22 (Tracy Fisher); Ex. 59]. Mr. Fisher's concerns were honest, legitimate and sincere. [Vol. III at 510:13–513:17 (Tracy Fisher)].

E.  Plaintiff's Revised Second Request for Accommodation & Job Performance

66.   On May 31, 2016, Ms. Unrein's physician wrote a letter stating that Ms. Unrein could no longer see well enough to perform her job as a Clinical Dietician. [Ex. 60]. That professional, medical determination has never been amended or altered.

67.   On June 13, 2016, Ms. Unrein submitted an updated accommodation request. [Ex. 61].  She requested an accommodation of full-time telecommuting via Skype or a similar telecommunication application while working 32 hours per week.

68.   In her deposition, Ms. Unrein testified that her request in her June 13, 2016, letter was to telecommute every day when she needed to work at the hospital. [Vol. II at 285:11-286:3 (Ms. Unrein)].

69.   Mr. Fisher, Ms. Brinkman, Ms. Owen, and Ms. Bass met with Ms Unrein on July 11, 2016, to discuss her full-time telecommuting request. [Stipulated Facts  ¶ 15;

Vol. I at 112:10–22 (Janet Brinkman); Vol. III at 439:2–5 (Summer Owen); Exs. 64, 65].

During this meeting, the hospital representatives inquired about Ms. Unrein's home

internet security, how she could ensure the security of confidential patient records, how

she could Skype with a patient and family simultaneously, who would transport the

computer between patient rooms, and other concerns associated with a hospital

clinician requesting to provide patient care remotely full-time.

70.   On August 4, 2016, Ms. Unrein told Ms. Brinkman that she wanted to use

FMLA leave to go on vacation the following day and that she thought that Mr. Fisher

was "frustrated" with her unavailability. [Vol. I at 114:22–115:5 (Janet Brinkman); Ex. 67

at 1]. Ms. Brinkman spoke with Mr. Fisher about Ms. Unrein's requested vacation day,

which she was trying to take as FMLA leave.  Mr. Fisher said that he supported any

employee's need to take FMLA leave and that he was not mad at Ms. Unrein for taking

FMLA leave.  [Vol. I at 114:22–115:5 (Janet Brinkman); Vol. III at 526:5–528:6 (Tracy

Fisher); Ex. 67].

71.   Consistent with the several conversations Mr. Fisher had with Ms. Unrein

previously, he told Ms. Brinkman that he was frustrated with Ms. Unrein's failure to let

him know when she was going to be available because it was causing problems with

delivering quality patient care. [Vol. I at 116:8– 119:15 (Janet Brinkman); Vol. III at

524:8–528:8 (Tracy Fisher); Ex. 67]. Mr. Fisher stated further that he had received

numerous complaints and questions because staff does not feel they can depend on

Ms. Unrein to be available when a Clinical Dietician is needed. [Vol. III at 524:8–528:8

(Tracy Fisher); Ex. 67].

72.   On August 8, 2016, Ms. Brinkman and Mr. Fisher met with Ms. Unrein to

discuss her performance and accommodation request. [Vol. I at 113:22–114:21; Vol. III

at 524:8–528:8; Ex. 69]. Ms. Brinkman again instructed Ms. Unrein to communicate with Mr. Fisher regarding her schedule. [Vol. I at 113:22–114:21; Vol. III at 524:8–528:8; Ex. 69]. Ms. Brinkman told Ms. Unrein that her accommodation request was under consideration, that the hospital was waiting to find out whether it could bill for Ms. Unrein's services if she was performing them remotely, and that she would provide Ms. Unrein with an answer as soon as possible. [Id.]

73.  In a letter dated August 9, 2016, Ms. Unrein said "it is necessary for patient care for me to see the in-patients as much as I can." Ms. Unrein said also that she was struggling to "figure out how to address Tracy's need for structure and my inability to provide long-term scheduling." [Ex. 70, Bates p. 500].

74.  Mr. Fisher continued to believe that increased, regular, and predictable presence at the hospital by Ms. Unrein would positively impact the services provided by the Food and Nutrition Services Department and patient satisfaction. [Vol. III at 503:15–505:16 (Tracy Fisher)].  From April through August 2016, as a result of Ms. Unrein's singular dependence on family or friends for rides to and from the hospital, Ms. Unrein would often change her schedule on short-notice and be unavailable to meet with her supervisor in-person.  [Vol. III at 514:24–516:22 (Tracy Fisher) ; Exs. 72, 76, 108, 110, 112, 113].

75.  Mr. Fisher continued to receive complaints and reports that patients were not receiving dietary consults in compliance with the hospital's polices or regulations. [Exs. 77, 112]. Even when she was working remotely, Ms. Unrein sometimes experienced computer problems that prevented her from completing her work.  [Vol. II at 298:1–13 (Ms. Unrein); Vol. III at 522:4–18 (Tracy Fisher); Exs. 69, 70, 73, 74, 75].

76.  Ms. Unrein testified at trial that, as a general matter, she attended scheduled

appointments and meetings during 2015 and for the first eight months of 2016.  [Vol I at 165:8-167:14.  To the extent this general testimony of Ms. Unrein differs from the detailed testimony of Janet Brinkman, Tracy Fisher, Sonja Bass, and Summer Owen on these points, I find the testimony of Ms. Brinkman, Mr. Fisher, Ms. Bass, and Ms. Owen to be more credible.  Generally, these four people testified consistently with each other and their detailed testimony is supported by written, contemporaneous documentation.

77.  The hospital did not allow any other full-time employees to telecommute on a full-time basis. [Vol. I, 77:19–78:4 ; Vol. II at 285:3–287:1]. Ms. Unrein and Ms. Wilson testified that a psychologist or psychiatrist provided services in the Behavioral Health Unit remotely, but were unable to provide any relevant details such as when it occurred, how long it occurred, whether there were any difficulties with it, whether it stopped and, if so why, all of which are critical to determine whether it is a fact that is relevant to the issues in dispute in this lawsuit. Based upon the record evidence, it simply is not.

### F.  Requests for Accommodation Declined, Separation From Employment

78.  The hospital considered carefully and thoughtfully Ms. Unrein's request for a flexible schedule..  The hospital considered carefully and thoughtfully Ms. Unrein's request to perform all of her job duties remotely via full-time telecommuting.

79.  On August 31, 2016, the hospital declined those requests. [Stipulated Facts ¶ 17; Vol. I at 77:19–79:6, 128:11–18 (Janet Brinkman); Vol. III at 549:20–550:8 (Tracy Fisher); Ex. 84].

80.  Among other things, the hospital stated in its letter of August 31, 2016:

Providing Clinical Dietician services to our patients, families, physicians, and other clinical personnel requres, at minimum, four hours per day of face-to-face interactions with patients, families, physicians, and/or other clinical personnel, one hour per day tray line assembly /review /training

/delivery, and 30 minutes of attendance at the daily care conferences
where every discipline in patient care is represented, in addition to the
time it takes to perform other duties of the position.

[Ex.84].  The hospital concluded reasonably that the duties specified in its letter of

August 31, 2016, constituted essential functions of the job of Clinical Dietician at the

hospital.

81.  In addition, the hospital based its decision on the technological challenges of

Ms. Unrein's home internet speed and capabilities, infection control issues related to

moving a computer among patients' rooms and kitchen areas, and the need to hire a

full-time employee to transport equipment between rooms and assist with set-up and

the distribution of informational handouts. [Stipulated Facts, ¶ 17; Vol. I at 122:12

–123:8; Exs. 84, 85]. The parties stipulate that the hospital's stated concerns about Ms.

Unrein's full-time telecommuting request were "reasonable, honest and legitimate."

[Stipulated Facts, ¶ 19].

82.  The hospital offered to continue discussing other potential accommodations,

along with the alternative for Ms. Unrein to apply for other open positions for which she

may have been qualified. [Stipulated Facts, ¶ 18; Ex. 84].  Ms. Unrein did not review or

apply for any other positions at the hospital. [Stipulated Facts, ¶ 18; Vol. II at

301:15–302:19 (Ms. Unrein)].

83.  In a letter dated March 27, 2017, the hospital notified Ms. Unrein that her

employment would be separated effective March 31, 2017. [Stipulated Facts, ¶ 28; Vol.

I at 128:2–7 (Janet Brinkman); Ex. 93]. The hospital explained in writing and

telephonically that it had explored accommodations with Ms. Unrein, but Ms. Unrein had

made clear that she was unable to perform the essential functions of her job on a full

time basis at the hospital.

84.   Among other things, the hospital said in its March 27, 2017, letter:

Predictable and regular attendance at the hospital so that you can meet with patients, assess their condition and perform other tasks is an essential function of your position as a Clinical Dietician that cannot be accommodated through telecommuting and irregular and unpredictable physical presence at the hospital. You have made clear that you cannot work within those parameters and you are unable to return to a full-time position at the hospital that requires your physical presence.

[Ex. 93].

85.   Since Ms. Unrein's employment with the hospital ended, she has made no effort to look for another job. [Vol. II at 323:20–25 (Ms. Unrein)].

G.   Summary of Requests for Accommodation Pursued by Ms. Unrein

86.   Between November 13, 2014, and June 13, 2016, Ms. Unrein proposed in some fashion five different accommodations: (1)temporary housing in Fort Morgan; (2) adaptive equipment; (3) FMLA leave; (4) providing a flexible schedule to meet her transportation difficulties [Exs.13, 32]; and (5) full time telecommuting [Ex. 61].

87.   Ms. Unrein represents that she withdrew her request for temporary housing. [Vol. II at 232:24-233:17 (Ms. Unrein)].

88.   The hospital provided all of the adaptive equipment requested by Ms. Unrein.  Vol. II at 226:4–227:6 (Ms. Unrein)].

89.   As detailed below, the hospital granted Ms. Unrein all of the FMLA leave she requested.

90.   As detailed above, the hospital attempted to permit Ms. Unrein to adjust her work schedule to accommodate her transportation difficulties.  After attempting to make this accommodation work, the hospital concluded that Ms. Unrein was not able to arrange a flexible but predictable schedule which permitted her to perform the essential functions of her job by spending majority of her 32 hours per week working on-site at

the hospital.  This conclusion was reasonable, honest, and legitimate.

91.  On June 13, 2016, Ms. Unrein amended her request for accommodation.  In her amended request, Ms. Unrein sought accommodation in the form of full-time telecommuting, rather than a flexile schedule to accommodate her transportation issues. [Exs. 61, 62].

92.  The hospital considered carefully the requests for a flexible schedule and the request for full-time telecommuting. When the hospital rejected these requests, the hospital relied on a reasonable assessment of the essential functions of the position of Clinical Dietician and a reasonable, honest, and legitimate assessment of the reasons why these proposed accommodations would not permit Ms. Unrein to perform the essential functions of her job.

H.  Medical Leave & Applications For Disability Benefits

93.  As noted previously, on May 31, 2016, Ms. Unrein's physician determined that she could no longer see well enough to perform her job as a Clinical Dietician. [Ex. 60]. That professional, medical determination has never been amended or altered.

94.  In August 2016, Ms. Unrein experienced an undiagnosed medical condition – unrelated to her vision issues – which prompted her treating physician to place her on full-time medical leave as of August 22, 2016, with an unknown return to work date. [Stipulated Facts, ¶ 20; Ex. 79].  Based on this restriction and later restrictions specified by Ms. Unrein's physicians, the hospital approved Ms. Unrein for continuous FMLA leave through at least January 2017. [Stipulated Facts, ¶¶ 20-22; Ex. 88, p. 3; Ex. 89, p. 4].

95.  None of Ms. Unrein's physicians has released her to return to work in any capacity.  Stipulated Facts, ¶ 23.

96.   While Ms. Unrein's revised second request for accommodation was under consideration by the hospital, Ms. Unrein applied for and was approved for long-term disability insurance benefits.  This application was made in January 2017. [Stipulated Facts, ¶ 27; Exs. 89, 90]. To receive those benefits, Ms. Unrein represented that she was completely unable to work. [Vol. II at 321:23–322:6 (Ms. Unrein)].  Ms. Unrein testified that she was truthful in her application for long-term disability benefits. [Vol. II at 322:1–6 (Ms. Unrein)].  She was approved for long-term disability benefits. [Stipulated Facts, ¶ 27].

97.  On February 8, 2017, Ms. Unrein completed her application for Social Security Disability Insurance (SSDI) benefits with the Social Security Administration. [Stipulated Facts, ¶ 25; Ex. 91]. To receive those benefits, Ms. Unrein represented and affirmed under oath that she became completely unable to work because of her disabling condition beginning on August 23, 2016. [Id.].  Ms. Unrein testified that she was truthful in her application for SSDI benefits. [Vol. II at 321:9–12 (Ms. Unrein)]. Based upon her representations, the SSA approved Ms. Unrein's application and awarded her SSDI benefits, which she continued to receive at least through the dates on which this case was tried. [Stipulated Facts, ¶ 26; Vol. II at 322:3–22 (Ms. Unrein); Ex. 91, Bates p. 1041].

## CONCLUSIONS OF LAW

### I.  ADA & CADA Claims

1.  At the relevant times, the hospital was a covered employer, as the term is defined by the ADA and the CADA.

2.  To establish a claim of failure to accommodate under the ADA and the CADA, a plaintiff must prove by a preponderance of the evidence that "(1) she is disabled; (2)

she is 'otherwise qualified'; and (3) she requested a plausibly reasonable accommodation." ***Punt v. Kelly Servs.***, 862 F.3d 1040, 1050 (10th Cir. 2017). If a plaintiff does so, then the burden shifts to the employer to establish an affirmative defense, such as undue hardship. ***Id.***

3.  Whenever possible, the CADA should be interpreted consistently with the ADA. ***Tesmer v. Colorado High School Activities Ass'n***, 140 P.3d 249, 253 (Colo. App. 2006).  Nothing in the record of this case shows that the CADA claims of Ms. Unrein should be treated differently than her ADA claims.

4.  The conclusions of law, based on the law applicable to the ADA claims and stated in terms of the law applicable to the ADA claims, apply equally to the claims under the CADA.  Every reference to the law relevant to the ADA claims shall be treated also as a reference to the parallel law controlling the CADA claims.

5.  The request of Ms. Unrein for temporary housing as an accommodation was withdrawn by Ms. Unrein.  The request of Ms. Unrein for adaptive equipment was satisfied by the hospital.  The requests of Ms. Unreain for FMLA leave were satisfied by the hospital.  None of these requests is a valid basis for an ADA claim by Ms. Unrein.

A.  Failure To Accommodate

6.  The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C.A. § 12102(2).  The impairment to her vision suffered by Ms. Unrein is a disability.

7.  The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential

functions of the employment position that such individual holds or desires." 42 U.S.C. §
12111(8).

8.   "The determination of whether a requested accommodation is reasonable
must be made on the facts of each case taking into consideration the particular
individual's disability and employment position." **Punt v. Kelly Servs.**, 862 F.3d 1040,
1050 (10th Cir. 2017) (internal quotation marks omitted).   "Whether an accommodation
is reasonable under the ADA is a mixed question of law and fact." **Mason v. Avaya
Communications, Inc.**, 357 F.3d 1114, 1122 (10th Cir. 2004).   "(A)n employee's
request to be relieved from an essential function of her position is not, as a matter of
law, a reasonable or even plausible accommodation." **Id**.

9.   The essential function analysis "is not intended to second guess the employer
or to require [it] to lower company standards . . . . Provided that any necessary job
specification is job-related, uniformly enforced, and consistent with business necessity,
the employer has a right to establish what a job is and what is required to perform it."
**Hennagir v. Utah Dep't of Corr.**, 587 F.3d 1255, 1262 (10th Cir.2009) (internal
quotations omitted). **cf. Davidson v. Am. Online, Inc.**, 337 F.3d 1179, 1191 (10th Cir.
2003) (stating that evidence of what an employer thinks is an essential job function is
important, but not conclusive).

10.   Factors to consider to determine if a job function is essential include, but are
not limited to

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing
applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

11.   Applying the ADA standards specified above, the following duties are essential functions of the Clinical Dietician position held by Ms. Unrein:

A.   Provide clinical and advisory duties for the Food Services Department;

B.   Provide current nutritional information and instruction to staff, physicians, and patients, as needed;

C.   Work with physicians, nurses, and other department staff in providing quality patient care;

D.   Work in close contact with patients in offices and rooms, often in confining spaces;

E.   Throughout a work day, cover most of hospital, and work in various departments and spaces with other staff; and

F.   Be present at the hospital to consult with patients who are hard of hearing, to educate patients on nutritional issues, to examine patients' food trays to insure compliance with their nutrition plan, to answer patient call lights on matters related to nutrition, and to perform high-risk patient assessments.

12.   Each of these essential functions is job-related, uniformly enforced, and consistent with business necessity.

13.   The above essential functions generally require the Clinical Dietician to be physically present at the hospital for at least four hours per work day and to have a set and predictable schedule to ensure quality patient care.

14.   Additional essential functions of the Clinical Dietician position include

charting on patient records and nutritional analysis of menus.  In terms of time required, these duties are a relatively small portion of the duties of the Clinical Dietician. Presence at the hospital sometimes is not necessary for performance of these duties.

15.  "[P]hysical attendance in the workplace is itself an essential function of most jobs."  ***Mason v. Avaya Communications, Inc.***, 357 F.3d 1114, 1119 (10th Cir. 2004). "(A) request to work at home is unreasonable if it eliminates an essential function of the job."  ***Id***. at 1124.  "Determination of whether a request for an at-home accommodation is reasonable must . . . be made on a case-by-case basis."  ***Id***.  An employee's request to work from home "is, as a matter of law, unreasonable" if physical presence at the workplace is an essential function of the position.  ***Id***.

16.  The hospital attempted to permit Ms. Unrein to have a flexible schedule as an attempted accommodation.  This experiment failed.  As detailed above, using a flexible schedule, Ms. Unrein was often unable to regularly perform the essential duties of the Clinical Dietician position.  Particularly important, Ms. Unrein was not consistently able to be present at the hospital for at least four hours per work day and to have a set and predictable schedule within that four hour requirement.

17.  The flexible schedule accommodation proposed by Ms. Unrein was not a reasonable accommodation.  Even with the hospital's best effort to implement this accommodation, Ms. Unrein was not able to perform the essential functions of her position using a flexible schedule which was significantly unpredictable because her transportation was significantly unpredictable.  This requested accommodation was not a plausibly reasonable accommodation.

18.  For similar reasons, the requested accommodation of full-time telecommuting was not a plausibly reasonable accommodation.

19.   When the hospital rejected these two requested accommodations, the hospital relied on a reasonable assessment of the essential functions of the position of Clinical Dietician and a reasonable, honest, and legitimate assessment of the reasons why a flexible schedule and/or full-time telecommuting would not permit Ms. Unrein to perform the essential functions of her job.  Particularly important, both the flexible schedule, as attempted by the hospital and Ms. Unrein, and full-time telecommuting would not permit Ms. Unrein to be present at the hospital on a consistent basis for at least four hours per work day.  Such a presence is an essential function of the Clinical Dietician position.  These requested accommodations were not plausibly reasonable accommodations.

20.   Ms. Unrein has not proven her ADA failure to accommodate claim because the evidence in the record does not show by a preponderance of the evidence that (1) Ms. Unrein was qualified to perform the essential duties of her position, with reasonable accommodations; and (2) Ms. Unrein proposed plausibly reasonable accommodations.

## B.  Interactive Process

21.   When  a qualified individual informs her employer of a disability, the employer must engage the employee in an interactive process to determine if there is a reasonable accommodation which might enable the employee to continue working. See 29 C.F.R. § 1630.2(o)(3); *Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1171-1173 (10th Cir.1999).  The interactive process permits employers and employees to work together to identify the employee's precise limitations and to discuss accommodations which might enable the employee to continue working.

22.   Ms. Unrein claims she can assert a stand-alone failure to accommodate claim based on her contention that the hospital failed to engage in the interactive

process in good faith.  **Final Pretrial Order** [#54], p. 5.  Under the ADA, a plaintiff may

not assert a a failure to accommodate claim based solely on an allegation that a

defendant employer failed to engage in the interactive process. ***Smith v. Midland***

***Brake, Inc.***, 180 F.3d 1154, 1174 (10th Cir. 1999) (en banc) ("Even if Midland Brake

failed to fulfill its interactive obligations to help secure a reassignment position, Smith

will not be entitled to recovery unless he can also show that a reasonable

accommodation was possible and would have led to a reassignment position.")

23.  The hospital worked diligently and consistently with Ms. Unrein to assess the

accommodations she requested.  The evidence demonstrates that the hospital, acting in

good faith, repeatedly and consistently engaged with Ms. Unrein in the interactive

process to determine if a reasonable accommodation was available.

24.  The hospital satisfied the interactive process requirement of the ADA.

25.  Even if the hospital somehow failed to engage in the interactive process

adequately, that alone would not prove the ADA claim of Ms. Unrein.  This is true

because, based on the evidence in the record, Ms. Unrein has not shown that she

proposed a reasonably plausible accommodation and that a reasonably plausible

accommodation was possible.

26.  There is no basis for a stand alone ADA claim based on a contention that the

hospital failed to engage in the interactive process.

C.  Retaliation

27.  To prove a prima facie claim of retaliation under the ADA, Ms. Unrein must

prove: (1) she engaged in a protected activity, such as a request for accommodation or

opposition to disability discrimination; (2) she was subjected to an adverse employment

action subsequent to or contemporaneous with the protected activity; and (3) there was

a causal connection between the protected activity and the adverse employment action. *Foster v. Mountain Coal Company, LLC*, 830 F.3d 1178, 1187 (10th Cir. 2016).

28.   Addressing her retaliation claim in the **Final Pretrial Order** [#54], Ms. Unrein said if "CPMC offers a legitimate, non-discriminatory reason for its employment decision, Plaintiff bears the burden of proving that CPMC's reason for terminating were pretext for retaliation and that retaliation was the 'but for' cause of CPMC's decision." *Final Pretrial Order* [#54], p. 5.   As to the second element of her retaliation claim, Ms. Unrein relies on the termination of her employment by the hospital as the retaliatory action taken by the hospital.

29.   In the **Plaintiff's Proposed Findings of Fact, Conclusions of Law & Judgment** [#65], tendered by Ms. Unrein post-trial, Ms. Unrein contends the hospital retaliated against her "by refusing to engage in the interactive process, refusing to accommodate her disability, and terminating Plaintiff's employment." *Plaintiff's Proposed Findings of Fact, Conclusions of Law & Judgment* [#65], p. 11. This proposal expands the retaliation claim of Ms. Unrein beyond the scope of the claim preserved in the **Final Pretrial Order** [#54].

30.   Under Fed. R. Civ. P. 16(d), the final pretrial order "controls the course of the action unless the court modifies it."   Under Fed. R. Civ. P. 16(e), the "court may modify the order issued after a final pretrial conference only to prevent manifest injustice." "Unless the court modifies its pretrial order, the parties are bound by their admissions and stipulations included in the order and may not contradict its terms."   *Air-Exec, Inc. v. Two Jacks, Inc.*, 584 F.2d 942, 944 (10th Cir. 1978) (citation omitted).

31.   The **Final Pretrial Order** [#54] has not been modified.   Based on the claim

of retaliation preserved in the **Final Pretrial Order** [#54], I recognize only the termination of Ms. Unrein's employment as the alleged act of ADA retaliation.

32.   Ms. Unrein claims she engaged in protected activity when she requested reasonable accommodations, complained to the hospital's ethics hotline, and filed a charge of discrimination with the Colorado Civil Rights Division.

33.   "To establish a causal connection, [a plaintiff] must present evidence of circumstances that justify an inference of retaliatory motive." ***Ward v. Jewell***, 772 F.3d 1199, 1203 (10th Cir. 2014).

34.   Nothing in the evidence presented at trial shows circumstances which support an inference of retaliatory motive by the hospital or any of its officials when the hospital decided to terminate the employment of Ms. Unrein.  Rather, the evidence demonstrates a substantial effort by the hospital to assess the accommodations proposed by Ms. Unrein as well as a sustained, good faith effort by the hospital to determine if any of the proposed accommodations were workable.

35.   None of the evidence in the record tends to show that any hospital official had a retaliatory motive tied to Ms. Unrein's complaint to the ethics hotline or to Ms. Unrein's filing of a charge of discrimination with the Colorado Civil Rights Division.

36.   When the hospital rejected her proposed or requested accommodations, the hospital relied on a reasonable assessment of the essential functions of the position of Clinical Dietician.  In addition, the hospital made a reasonable, honest, and legitimate assessment of the reasons why the accommodations proposed by Ms. Unrein, an unpredictable and flexible schedule and full-time telecommuting, did not permit Ms. Unrein to perform the essential functions of her job.

37.   Even if I permitted, improperly, Ms. Unrein to expand her retaliation claim to

include the alleged refusal of the hospital to engage in the interactive process and the alleged refusal of the hospital to accommodate her disability, the evidence does not support these additional claims of retaliation.

38.   The hospital engaged in the interactive process fully and in good faith.  The evidence does not support the contention that the hospital refused to engage in the interactive process.

39.   The hospital considered the various accommodations proposed or requested by Ms. Unrein and concluded, reasonably, that none of the proposed accommodations would permit Ms. Unrein to perform the essential functions of her job as Clinical Dietician.

40.   On this record, I conclude that there is scant, if any, evidence of a retaliatory motive by any relevant hospital official. Certainly, Ms. Unrein has not presented evidence which shows, by a preponderance of the evidence, a retaliatory motive of any relevant hospital official.

41.   Ms. Unrein has not proven her claim of retaliation under the ADA because the evidence in the record does not establish by a preponderance of the evidence that there was a causal connection between her protected activity and the adverse employment action taken by the hospital when it terminated her employment.

## ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1.   That judgment shall enter in favor of the defendant, PHC-Fort Morgan, Inc., d/b/a Colorado Plains Medical Center, and against the plaintiff, Joan Unrein, on each of the claims asserted in the **Complaint** [#4] and preserved in the **Final Pretrial Order** [#54];

2.  That under Fed. R. Civ. P. 54(d)(1), the defendant, PHC-Fort Morgan, Inc.,

d/b/a Colorado Plains Medical Center, is awarded its costs, to be taxed by the clerk in

the time and manner prescribed by Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1;

and

3.  That this case is closed.

Dated May 13 2020, at Denver, Colorado.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge